IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SENSORMATIC SECURITY                    :
CORPORATION                             :

        v.                              : Civil Action No. DKC 2002-1565

                                        :

SENSORMATIC ELECTRONICS                 :
CORPORATION, et al.                     :

### MEMORANDUM OPINION

Presently pending in this breach of contract action are (1) a motion for partial summary judgment filed by Plaintiff Sensormatic Security Corporation against Defendants Sensormatic Electronic Corporation, ADT Security Services, Inc., and Wallace Computer Services, Inc. (paper 202); (2) two motions to seal filed by Sensormatic Security Corporation (papers 203, 213); (3) a cross-motion for partial summary judgment filed by Defendant Sensormatic Electronic Corp. (paper 210); (4) a cross-motion for summary judgment filed by Defendants ADT Security Services, Inc., and Wallace Computer Services, Inc., with respect to claims asserted against them by SSC (paper 211); and (5) two motions to seal filed by all Defendants (papers 212, 217).[1]  The issues are briefed fully, and the court now rules pursuant to Local Rule 105.6, no

---

[1] The parties had filed these motions previously.  Because the parties were engaged in settlement discussions, the court dismissed these motions without prejudice with the understanding that if settlement discussions were unsuccessful, the parties could renew their motions.  (Paper 223).  The parties were unable to settle their dispute, and have now renewed their motions.  (Paper 225, 227).

hearing being deemed necessary.  For the reasons that follow, the court will grant in part and deny in part the motion of Sensormatic Security Corporation for partial summary judgment; deny in part and grant in part the cross-motion of Sensormatic Electronic Corporation for summary judgment on SSC's complaint and deny its motion for summary judgment on its counterclaim; deny the cross motion of ADT Security Services and Wallace Computer Services for summary judgment; and deny all motions to seal.

I.   **Background**

A.   **Factual Background**

The following facts are undisputed unless noted.  Sensormatic Electronic Corp. ("Sensormatic") manufactures a broad range of anti-theft and security products.  Sensormatic was an independent, publicly traded company until Tyco International Ltd. ("Tyco") acquired Sensormatic on November 13, 2001.  Sensormatic is now a wholly-owned subsidiary of Tyco, and is part of the Tyco Safety Products group within Tyco's Fire and Security Services business unit.  Sensormatic Security Corporation ("SSC"), a franchisee of Sensormatic since 1967, claims an exclusive right to sell, lease, distribute, service, repair, and maintain Sensormatic products in Maryland, the District of Columbia, and Virginia ("franchise territory").   ADT Security Services, Inc. ("ADT"), is also a wholly-owned subsidiary of Tyco, within the Fire and Security Services business unit.    Wallace Computer Services, Inc.

("Wallace"), a company that manufactures pressure sensitive adhesive labels, is a third party and has no corporate affiliation with Tyco.

Two writings govern the SSC-Sensormatic franchise. First, the Restated Franchise Agreement ("Franchise Agreement"), dated December 1, 1976, provides the following. Section 9(c) prohibits Sensormatic from competing with SSC in selling or leasing equipment in SSC's territory and from granting "to any third party a franchise or any other right to sell, lease or service Equipment in [SSC's] territory." Section 10 states that Sensormatic has the right "to lease, sell or otherwise distribute Equipment to national accounts for use either within or without the Franchisee's Territory, and to contract for service, repair and maintenance in connection therewith . . ." When sales are made pursuant to § 10, Sensormatic must pay commissions to SSC based on the commissions system described in § 7.A.[2]

The Franchise Agreement provides the following definitions:

> Equipment: "all Detection Devices, Tags, Accessories and Supplies." § 1(d).

> Detection Devices: "the detection systems and devices presently being marketed by the Franchisor for Automatic Theft Detection Uses

---

[2] Section 7A(i) states: "[t]he Franchisee shall receive commissions for the lease or sale of Detection Devices, Tags, Accessories and Supplies for use in the Franchisee's Territory as follows: Forty percent (40%) of the gross revenues received by the Franchisor from the lease or sale of Detection Devices and Tags. . . . ."

. . . which include a transmitter and coordinated receiver and alarm console, and which may be installed and used as a system or device to activate and detect Tags, sounding an alarm or otherwise activating a control device, and all successors thereto." § 1(a).

Tags: "include[s] tags, labels, sensors, transponders and sensoremitters and the like, marketed by the Franchisor for Automatic Theft Detection Uses." § 1(b).

Automatic Theft Detection Uses: "uses for the prevention and detection of shoplifting and other theft." § 1(e). The definition includes a list of examples.

National account: "any customer, or potential customer, or any person or entity who or which controls, or is controlled by, or is under common control with, such customer, of the Franchisor or Franchisee who or which has leased or purchased or may lease or purchase products for use in more than one state or territory. § 10.

(Paper 202, ex. A).

The second writing is a settlement agreement ("Settlement Agreement"), signed December 7, 1984, that was reached as the result of litigation commenced in 1983. The Settlement Agreement expressly amended certain provisions in the Restated Franchise Agreement. Paragraph two reads, in part:

The Company agrees that the Company's SensorVision (CCTV) System, and the Company's present and future CCTV product lines of which the SensorVision System is a part, shall be included within the franchise under the Franchise Agreement, for Automatic Theft Detection Uses (as defined in the Franchise Agreement), as well as for surveillance in other common areas of customers for the Company's Equipment for Automatic Theft

4

> Detection Uses, and in that connection shall
> be included within the meaning of Detection
> Devices, Accessories, Supplies and Equipment
> (as defined in the Franchise Agreement), as
> the case may be.

The parties further agreed there was "no meeting of the minds between them as to whether future products of the Company (other than future products on the microwave, electro-magnetic and CCTV product lines) are or are not included or to be included under the Franchise Agreement." (Paper 202, ex. C, § 5). The Settlement Agreement provided a commission rate with respect to sales of CCTV products. (Paper 202, ex. C, § 2).

The parties' dispute in this lawsuit involves two categories of Sensormatic products and whether sales of these products to certain customers are within the scope of the Franchise Agreement. The first category is electronic article surveillance systems ("EAS"), which are used to detect and prevent item-level theft primarily at retail stores.[3] The EAS products appear to be the products Sensormatic manufactured when the parties signed the Franchise Agreement in 1976. The second category is closed circuit television ("CCTV"), which can be used for theft detection in a retail setting as well as in non-retail settings for surveillance purposes. After the Settlement Agreement was signed, Sensormatic made available to SSC all of its CCTV products to market, lease and

---

[3] These systems sound an alarm when a still-active tag passes through pedestals typically installed near the store exit.

sell, and Sensormatic paid commissions to SSC for CCTV products sold within SSC's franchise territory.

In addition to disputes over these products, the parties disagree as to whether Sensormatic's authorization of sales by ADT, Wallace, and other third parties violated the terms of the Franchise and Settlement Agreements.

On February 11, 1997, Wallace and Sensormatic entered into a licensing agreement ("Wallace License Agreement") by which Wallace obtained the right to manufacture and sell a particular type of label known as Ultra•Max labels.  The Wallace License Agreement authorized Wallace to sell the labels throughout the United States, and placed no limits on Wallace's ability to sell labels in SSC's franchise territory.  The Wallace License Agreement recognized the existence of a Franchise Agreement between Sensormatic and SSC, and stated:

> Sensormatic is a party to a Restated Franchise Agreement . . . . [which] grants SSC certain exclusive rights within the territory of Maryland, Virginia and Washington, D.C. regarding the sale, lease or distribution of certain Sensormatic products.
>
> It remains to be determined whether such franchise rights would be applicable to sales by Wallace or whether, as result of any such franchise rights, special provisions would have to be made between Sensormatic and Wallace . . .

(Paper 202, ex. M, schedule 3).  Wallace also obtained an agreement from Sensormatic in which Sensormatic agreed to "indemnify, defend

and hold harmless Wallace from and against any Damages arising out of or resulting from any claims asserted by SSC against Wallace arising under or relating to the Franchise Agreement . . . ." (Paper 202, ex. N).

In addition to Wallace, in mid-2000, Sensormatic authorized Intelligent Marketing to set up a network of dealers and distributors in SSC's franchise territory.  Sensormatic has identified 102 dealers and distributors authorized to sell, install, and service Sensormatic CCTV products in SSC's franchise territory.  ADT was among the authorized dealer/distributors.  SSC objected when it learned of the existence of dealer/distributor competition in its franchise territory.

Furthermore, Sensormatic authorized eight companies to distribute EAS labels throughout the United States.  The contracts with these companies do not impose any geographical restrictions on their ability to sell in SSC's franchise territory.

Finally, after Tyco acquired Sensormatic, Sensormatic's sales force was transferred to ADT, and its sales division has handled the national sales of EAS products.  ADT also continued selling CCTV products to customers in SSC's franchise territory.

**B.  Procedural Background**

The Second Amended Complaint contains seven counts:  Count I, breach of contract against Sensormatic, for authorizing third parties to sell and service Sensormatic products within SSC's

7

territory; Count II,  breach of contract against Sensormatic, for
failure to pay commissions; Count III, breach of contract against
Sensormatic, for failure to provide documentation; Count IV, breach
of contract and breach of covenant of good faith and fair dealing
against Sensormatic regarding replacement parts; Count V, unjust
enrichment against ADT; Count VI, tortious interference with
contract against Wallace based on its contract with Sensormatic;
and Count VII, tortious interference with contract against ADT, due
to its relationship with Sensormatic.

The court previously dismissed Count V.  SSC has moved for
partial summary judgment on Counts I, VI, and VII of its Second
Amended Complaint.  SSC also asserts that the principal liability
issues in Count II will be resolved by the current motion.  SSC has
not moved for summary judgment on Count III and Count IV.  (Paper
202, at 4 n.3).

Sensormatic filed a counterclaim seeking (1) a declaratory
judgment that it has the right under the Franchise Agreement to
terminate the Franchise Agreement on reasonable notice, and that
its letter of August 22, 2002, providing a minimum of six months
notice, constitutes reasonable notice (Count I); and (2) a claim
for unjust enrichment asserting that it inadvertently paid
commissions to SSC for CCTV products that were not within the scope
of the Franchise and Settlement agreements (Count II).  The court
previously dismissed Count I.  In its cross-motion for summary

judgment, Sensormatic seeks not only summary judgment in its favor on the issues SSC raised, but also summary judgment on SSC's claim for commissions on installation and service in Count I, and on Count IV relating to replacement parts.   It also seeks summary judgment on its unjust enrichment counterclaim.

## II.  Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979).   The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he or she is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party

opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party that bears the burden of proof on a particular claim must factually support each element of its claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."  *Celotex Corp.*, 477 U.S. at 323.  Summary judgment will not be appropriate unless the movant's evidence supporting the motion "demonstrate[s] an absence of a genuine dispute as to every fact material to each element of the movant's claim and the non-movant's response fails to raise a genuine issue of material fact as to any one element."  *McIntyre v. Robinson*, 126 F.Supp.2d 394, 400 (D.Md. 2000) (internal citations omitted).  On those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324.  However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment."  *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

When faced with cross-motions for summary judgment, as in this case, the court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). *See also havePOWER, LLC v. Gen. Electric Co.*, 256 F.Supp.2d 402, 406 (D.Md. 2003) (citing 10A Charles A. Wright and Arthur R. Miller, Federal Practice & Procedure § 2720 (3d ed. 1983)). The court reviews each motion under the familiar standard for summary judgment, *supra*. The court must deny both motions if it finds there is a genuine issue of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Federal Practice & Procedure § 2720.

**III. SSC's Motion for Partial Summary Judgment, Sensormatic's Cross-Motion for Summary Judgment, and Wallace's and ADT's Motion for Summary Judgment**

**A.   Collateral Estoppel**

SSC contends that some issues in the present lawsuit relating to the scope of its Franchise Agreement with Sensormatic were litigated previously in the United States District Court for the Western District of Pennsylvania in another dispute between Sensormatic and a franchisee for the Pennsylvania-Delaware region

("Pennsylvania franchise").   SSC asserts that the decision of the
Pennsylvania court is binding on Sensormatic as a matter of
collateral estoppel.   (Paper 202, at 23).   Sensormatic responds
that the Pennsylvania decision does not qualify for collateral
estoppel because (1) the Pennsylvania case involved different
issues; (2) the case was decided on alterative grounds; and (3)
Sensormatic did not have an opportunity to litigate fully and
fairly the issues relating to the scope of the Franchise Agreement.

Collateral estoppel prevents "the relitigation of issues of
fact or law that are identical to issues which have been actually
determined and necessarily decided in prior litigation in which the
party against whom [issue preclusion] is asserted had a full and
fair opportunity to litigate."   *Ramsay v. U.S. Immigration &
Naturalization Serv.*, 14 F.3d 206, 210 (4th Cir. 1994) (quoting *Va.
Hosp. Ass'n. v. Baliles*, 830 F.2d 1308, 1311 (4th Cir. 1987)).   When
a party asserts the doctrine, it must establish the following
elements:

> (1) the issue precluded must be identical to
> one previously litigated;
> (2) the issue must have been actually
> determined in the prior proceeding;
> (3) determination of the issue must have been
> a critical and necessary part of the decision
> in the prior proceeding;
> (4) the prior judgment must be final and
> valid; and
> (5) the party against whom estoppel is
> asserted must have had a full and fair
> opportunity to litigate the issue in the
> previous forum.

*Ramsay*, 14 F.3d 206 at 210. *See also Sedlack v. Braswell Servs. Group, Inc.*, 134 F.3d 219, 224 (4th Cir. 1998).

In *Sensormatic Electronics Corp v. First National Bank of Pennsylvania*, 99 cv 756 (W.D.Pa. May 13, 2005), Judge Schwab issued a Memorandum Opinion and Order that addressed, *inter alia*, the scope of the franchise agreement between Sensormatic and the franchisee for the Pennsylvania-Delaware region, Winner & Bagnara, Inc. ("Winner"). The Winner franchise agreement, dated November 30, 1978, was identical to the Franchise Agreement in the present lawsuit, except that it included an addendum ("Winner addendum") also signed on November 30, 1978. The Winner addendum amended the definition for Detection Devices and Automatic Theft Detection Uses.[4] In addition, the written instruments governing the Pennsylvania franchise did not include a settlement agreement

---

[4] The addendum stated:

"Detection Devices" shall also mean and include detection systems and devices similar to the detection systems and devices presently being marketed by the Franchisor for Automatic Theft Detection Uses and embodying the same technology, but specifically designed for Other Surveillance uses. "Automatic Theft Detection uses" shall also mean and include article surveillance uses other than the prevention and detection of shoplifting and other theft (e.g., personnel identification card detection), which other uses are sometimes herein referred to as "other Surveillance Uses."

13

similar to the Settlement Agreement at issue in the present lawsuit.

Like the parties in the present lawsuit, the parties in the Pennsylvania case disagreed about the scope of products covered by the franchise agreement. Sensormatic argued, in essence, that the product lines within the scope of the franchise agreement were limited to microwave-based technology. Winner argued that the scope was based on the product's use, i.e., the way in which the customer used the product. Winner supported its position, in part, by submitting evidence relating to products that were part of SSC's franchise.[5]

---

[5] Winner invoked SSC's Franchise Agreement because the Winner franchise agreement, like SSC's Franchise Agreement, contained a "More Favorable Contracts" clause. That provision stated:

> The Franchisor agrees that if it enters into any contract with any other franchisee with respect to a franchise similar to the franchise contemplated by this Agreement which contains any terms or condition more favorable than those described in this Agreement, then this Agreement shall immediately be deemed amended to include such terms or conditions and any other terms and conditions that were a condition to the granting of such more favorable terms and conditions, unless the Franchisee shall promptly upon notification or discovery of such amendment give notice to the Franchisor that it rejects such amendment.

(Paper 202, ex. B, at 15 n.2).

SSC has also relied on the More Favorable Contracts clause in order to invoke the Winner addendum in the present lawsuit. On August 28, 2003, SSC filed a motion for leave to file a third

(continued...)

The Pennsylvania court rejected Sensormatic's argument that the Winner franchise agreement was limited to microwave-based technology, and agreed with Winner that the scope of the agreement was determined by the product's use.  (Paper 202, ex. B, at 13).  The court held that the franchise included all product lines "use[d] for the prevention and detection of shoplifting and other theft."  *Id.* at 18 (quoting the franchise agreement) (internal quotation marks omitted).  The court further held that in addition to microwave-based technology, EAS products and technologies and CCTV systems were within the scope of the franchise.  In a footnote, the court explained that the ruling on the EAS and CCTV products was based on Winner's Most Favorable Contracts clause, which invoked the SSC-Sensormatic Franchise Agreement and Settlement Agreement.  *Id.* at 19 n.3.

Based on the foregoing, SSC cannot establish, at minimum, the first element of collateral estoppel.  First, the issues in the Pennsylvania case are not identical to the issues in the present litigation.  Although the Pennsylvania case dealt with the scope of the Winner franchise agreement, which was nearly identical to the SSC Franchise Agreement, the specific issues the Pennsylvania court

---

[5](...continued)
amended complaint because it wished to assert a claim that the Winner addendum modified SSC's agreement with respect to the Franchise Agreement and the Settlement Agreement.  (Paper 107).  The court denied SSC's motion for leave to amend, stating that SSC had not pursued the new claim diligently, and therefore, SSC failed to show good cause.  (Paper 147, at 8).

ruled upon were (1) whether the franchise agreement definitions were based on use or technology, (paper 202, ex. B, at 13); (2) whether the scope was limited to soft goods, i.e., clothing apparel, *id.*; and (3) what product lines were within the scope of the franchise, *id.* at 19.  The resolution of these issues involved an interpretation of the terms Detection Devices and Automatic Theft Detection Uses, as defined in the franchise agreement.  By contrast, the issue before this court is whether CCTV products are included within the scope of the franchise agreement, as defined by the Franchise Agreement and the Settlement Agreement. Specifically, this court is being asked to interpret the specific language in the Settlement Agreement – an issue that never arose in the Pennsylvania litigation.

Moreover, although the Pennsylvania ruling was based in part on a reading of the SSC-Sensormatic Franchise Agreement and Settlement Agreement at issue in the present litigation, SSC has not shown that Sensormatic had a full and fair opportunity to litigate the meaning of these two written instruments.  "[A] person cannot be bound by a judgment unless he has had reasonable notice of the claim against him and opportunity to be heard in opposition to that claim." *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 338 (5th Cir. 1982)(quoting 1B J. Moore, Moore's Federal Practice ¶ 0.411 at 1252 (2d ed. 1982)(internal quotation marks omitted)). In the present case, there is evidence that Sensormatic did not

have an opportunity to be heard on the issue of the scope of the
SSC-Sensormatic Franchise Agreement.  In a brief dated May 3, 2004,
Sensormatic submitted arguments with respect to the scope of the
Pennsylvania franchise but did not address either the More
Favorable Contracts clause or the meaning of the SSC-Sensormatic
Franchise Agreement and Settlement Agreement.  Instead, Sensormatic
stated that it would move separately, on June 1, 2004, for summary
judgment on the More Favorable Contracts clause.  (Paper 210, ex.
5, at 1 n.1).  The Pennsylvania court issued its opinion on May 13,
2004, before Sensormatic submitted its motion and memorandum.  SSC
points out that Sensormatic admitted in a memorandum submitted to
this court that "[i]n an earlier brief, [it] had argued that the
More Favorable Contracts provision did not apply to the Settlement
Agreement between Sensormatic and SSC" (paper 210, at 10 n.11).
Neither party has provided the brief and the court, therefore,
cannot determine whether it provided Sensormatic with a full and
fair opportunity to litigate the issues in the present lawsuit.[6]

Consequently, SSC has not met its burden of proof and the
Pennsylvania decision does not bind Sensormatic as a matter of
collateral estoppel with respect to CCTV systems.

--------

[6] Because the court agrees with two of Sensormatic's
arguments, it need not address the issue of whether the
Pennsylvania decision was based on alternative grounds.

**B.   The Scope of SSC's Rights with Respect to CCTV Systems**

SSC asserts that the Settlement Agreement, which amended the Franchise Agreement, gives SSC an exclusive franchise for Sensormatic's CCTV systems.   Sensormatic contends that the Settlement Agreement gave SSC an exclusive franchise only for the SensorVision System, which was an early CCTV system, and that subsequent CCTV systems are not within the scope of SSC's franchise rights.

The parties agree that Florida law governs the Franchise Agreement and the Settlement Agreement.[7]   (Paper 202, at 29 n. 21; Paper 210, at 15 n.13).   The Supreme Court of Florida has stated that "[o]rdinarily the interpretation of a written contract is a matter of law to be determined by the court."   *DEC Elec., Inc. v Raphael Constr. Corp.*, 558 So.2d 427, 428 (Fla. 1990); *see also Peacock Constr. Co. v. Modern Air Conditioning, Inc.*, 353 So.2d 840, 842 (Fla. 1977).   Moreover, "contract language that is unambiguous on its face must be given its plain meaning." *Green v. Life & Health of Am.*, 704 So.2d 1386, 1391 (Fla. 1998).   "The initial determination of whether the contract term is ambiguous is a question of law for the court . . . ." *Strama v. Union Fid. Life Ins. Co.*, 793 So.2d 1129, 1132 (Fla.Dist.Ct.App. 2001).

---

[7] The Franchise Agreement states that "[t]his Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida."   (Paper 202, ex. A, § 25).

If a provision in a contract is ambiguous, the court may resolve the ambiguity as a matter of law if the facts of the case are not in dispute.  *See Strama*, 793 So.2d at 1132.  Ambiguous terms "should be resolved in favor of upholding the purpose of the agreement and giving effect to every term in the agreement."  *City of Homestead v. Johnson*, 760 So.2d 80, 83 (Fla. 2000).  The court may consider parole evidence to "explain, clarify or elucidate" the ambiguous term.  *Friedman v. Va. Metal Prods. Corp.*, 56 So.2d 515, 517 (Fla. 1952). *See also Hibiscus Assocs. Ltd. v. Bd. of Trs.*, 50 F.3d 908, 919 (11th Cir. 1995) ("[W]hen a contract term is ambiguous, the best evidence of the parties' intent is the construction the parties themselves put on the agreement through their conduct.").

SSC presents several arguments as to why CCTV products are within the scope of its exclusive franchise.  First, SSC argues that § 2 of the Franchise Agreement gives it an exclusive franchise for products that include Detection Devices.[8]  The Franchise Agreement's definition of "Detection Devices" includes a description of such devices and expressly includes "all successors thereto."  SSC thus argues that "all successors thereto" refers to future products marketed to perform the same function.  Because

---

[8] Section 2 states that the Franchisor grants to the Franchisee "an exclusive franchise to lease, sell and/or otherwise distribute, and service, repair and maintain, in the Franchisee's Territory, Detection Devices, Tags, Accessories and Supplies for Automatic Theft Detection Uses . . . ."

CCTV products are marketed for "automatic theft detection uses," CCTV products are a "successor" product and are covered under the Franchise Agreement.

Second, SSC argues that the Settlement Agreement expressly extended the franchise to two categories of products: (1) "the Company's SensorVision (CCTV) System" and (2) "the Company's present and future CCTV product lines of which the SensorVision System is a part." SSC contends that the latter category refers to "future CCTV product lines" of which SensorVision is a part, thus, all future CCTV product lines are within the Franchise Agreement. Even if the language were read to cover only the SensorVision System itself, the franchise still would extend to future CCTV products because the Settlement Agreement added the SensorVision System to the definition of "Detection Devices," and the definition of "Detection Devices" includes "all successors thereto."

To support its argument, SSC points out that Section 5 of the Settlement Agreement states that "there presently is no meeting of the minds between [the parties] as to whether future products of the Company (other than future products in the microwave, electromagnetic and CCTV product lines) are or are not included under the Franchise Agreement." SSC claims this language confirms that the Settlement Agreement was not limited to any particular CCTV system.

Sensormatic responds that the Settlement Agreement added only the SensorVision System.  Because the Settlement Agreement did not use the language "and all successors thereto," the language used in the Franchise Agreement, the parties meant specifically the SensorVision System product line, as well as present and future lines of the SensorVision System, but not successor product lines. In other words, Sensormatic argues that the Settlement Agreement altered the definition of Detection Devices to include (1) the EAS devices described in the Franchise Agreement ("the detection systems and devices presently being marketed") and "all successors thereto" and (2) the SensorVision System product lines, but not successors to the SensorVision System product line.[9]  Sensormatic proceeds to argue that the SensorVision System no longer exists because it was phased out in the 1990s, the SensorVision System was replaced with an entirely different CCTV product, and these different CCTV products are not covered by the Settlement Agreement.

The court is unpersuaded by Sensormatic's attempt to limit the Settlement Agreement to CCTV products that are part of the SensorVision System.  First, the court finds no merit in Sensormatic's argument that the parties intended to alter the

---

[9] Sensormatic further argues that this CCTV-specific successor clause controls over any more general successor provision.  (Paper 210, at 17-18).  It is unclear to which general successor provision Sensormatic is referring.

definition of Detection Devices.  The Settlement Agreement expressly states that the SensorVision System and present and future CCTV product lines "shall be *included* . . . and in that connection shall be *included* within the meaning of Detection Devices . . . ." (emphasis added).  The term "include" is not the same as "alter" in the sense argued by Sensormatic.  Second, because the Settlement Agreement added or "included" SensorVision and CCTV products lines in the Franchise Agreement's definition of Detection Devices, there was no need to include the "and all successors thereto" language in the Settlement Agreement because the Detection Devices definition in the Franchise Agreement already contained this language.  Finally, the Franchise Agreement and the Settlement Agreement deal generally with products that have specific uses, rather than specific product lines.[10]  Thus, whether the product was once part of the SensorVision System does not determine whether the CCTV product lines are part of SSC's franchise.[11]  As discussed in the following section, the primary

_____

[10] For instance, Detection Devices is defined as "the detection systems and devices presently being marketed by the Franchiser for Automatic Theft Detection Uses (known as the Sensormatic System, and including the Double Checker) . . . ." (Paper 202, ex. A, §1(a)).  In addition, the definition for tags, accessories and equipment make no reference to a specific product.  *Id.* at § 1(b).  In the Settlement Agreement, Sensormatic agreed that its SensorGate System "and the present and future electro-magnetic product lines of the Company, of which the SensorGate System is a part, shall be included within the franchise . . . ." (Paper 202, ex, C, ¶ 1).

[11] Based on the foregoing, the court need not address the
(continued...)

issue is whether the product is used for "the prevention and detection of shoplifting and other theft."

The next issue SSC raises is whether SSC's franchise is limited to retail customers or whether its franchise extends to other, non-retail customers as well.  SSC contends that the Settlement Agreement extends the franchise to all customers, whether or not the customer uses the product in a retail setting, while Sensormatic contends that the franchise is limited to retail sales settings in which the customer uses the product for theft detection.[12]  The dispute arises, in part, from the following portion of the Settlement Agreement:

> The Company agrees that the Company's SensorVision (CCTV) System, and the Company's present and future CCTV product lines of which the SensorVision System is a part, shall be included within the franchise under the Franchise Agreement, for Automatic Theft Detection Uses (as defined in the Franchise Agreement), *as well as for surveillance in other common areas of customers for the Company's Equipment for Automatic Theft Detection Uses*, and in that connection shall be included within the meaning of Detection Devices, Accessories, Supplies and Equipment (as defined in the Franchise Agreement), as the case may be.

---

[11](...continued)
portion of the parties' arguments relating to what subsequent products are part of the SensorVision System.

[12] The retail/non-retail dispute appears to relate to the sale of CCTV products, but not EAS products.  At issue is the right to sell to customers who use Sensormatic products in a non-retail setting for a security purpose, such as airports, embassies, and federal courts.

(Paper 202, ex. C, § 2) (emphasis added).   The parties disagree about the meaning of the words "as well as for surveillance in other common areas of customers for the Company's Equipment for Automatic Theft Detection Uses."

SSC argues that there is no justification for limiting the Settlement Agreement to a retail setting because the Franchise Agreement's definition of "Automatic Theft Detection Uses" involves non-retail settings such as wholesalers, manufacturers, government agencies, service enterprises, libraries, museums, galleries, and similar institutions.  (Paper 202, at 39).  The Franchise Agreement also describes SSC's "primary area of responsibility" as "marketing of Equipment to retail stores *and other customers* for Automatic Theft Detection Uses."  (Paper 202, ex. A, § 4.B)(emphasis added). SSC further contends that its interpretation is consistent with the disputed language ("as well as for surveillance in other common areas") because the language allows for surveillance in "other common areas" such as hallways, employee lounges, entrances and exits, and parking garages or lots.  (Paper 202, at 39-40).

Sensormatic argues that § 2 of the Franchise Agreement extends only to (1) products sold "for Automatic Theft Detection Uses" (i.e., products used "for the prevention and detection of shoplifting and other theft") and (2) to customers who also are purchasing or already using Sensormatic's EAS or CCTV products for automatic theft detection (based on the language "as well as for

surveillance in other common areas of customers for the Company's Equipment for Automatic Theft Detection Uses"). (Paper 210, at 26). Sensormatic argues: "Under this limitation, the same customer must be purchasing or already using CCTV or EAS for automatic theft detection uses in the common area suited for such uses (i.e., the retail floor) and purchasing CCTV for surveillance in the 'other common areas.'" *Id.* Sensormatic also asserts that the way the product is used determines whether the product is within the scope of the Franchise Agreement, and the Franchise Agreement requires that the use be for automatic theft detection or limited surveillance uses (i.e., retail settings). *Id.* at 27.

Neither party's argument is entirely persuasive. SSC's interpretation (that all uses are within the scope of the Franchise Agreement) ignores the fact that the definition of Automatic Theft Detection Uses means "uses for the prevention and detection of shoplifting and other theft," and that the list of uses SSC cites (wholesalers, manufacturers, government agencies, service enterprises, libraries, museums, galleries, and similar institutions) are supplied as examples of where such products are used. CCTV products conceivably could be used in any of these settings for the prevention and detection of theft. On the other hand, Sensormatic's argument that the customer must already be purchasing or using CCTV or EAS products does not make sense. If

the parties wished to limit the franchise to existing customers, there are simpler and clearer ways to make such a limitation.

Section 2 is clear in certain respects.  It states that CCTV products "shall be included within the franchise under the Franchise Agreement, for Automatic Theft Detection Uses (as defined in the Franchise Agreement)."  The court agrees with Sensormatic that because Automatic Theft Detection Uses is defined as "uses for the prevention and detection of shoplifting and other theft," the use determines whether the sale of the product is within SSC's scope.  *See Sensormatic Electronics Corp.* (the Pennsylvania case), 99 cv 756, at 13 (holding that "[t]he 'Definitions' are 'use' based, not technology based"); *aff'd, Sensormatic Elecs. Corp. v. First Nat'l Bank Pa.*, 148 Fed.Appx. 99, 105 (3rd Cir. Aug. 31, 2005) (unpublished) (recognizing a "'use' based definition").  The court further agrees with SSC that the definition does not limit the franchise to the retail setting, as demonstrated by the list of uses identified in § (e), e.g., wholesalers, manufacturers, government agencies, service enterprises, libraries, museums, galleries, and similar institutions.  The most reasonable explanation for the disputed language ("as well as for surveillance in other common areas") is to recognize that the surveillance may occur in "other common areas" in addition to those listed in § 1(e).  Thus, the use determines whether the product is within the scope of the franchise, irrespective of whether that use is in a

26

retail or non-retail setting.  Because the court finds that the language is not ambiguous, it need not resort to the parties' course of conduct.  *See Roe v. Henderson*, 190 So. 618, 619 (Fla. 1939) ("If the terms of the contract are clear and certain, they will not be disturbed by usage no matter how well settled it may be nor will usage be permitted to read express terms from the contract."); *Caulkins Indiantown Citrus Co. v. Nevins Fruit Co., Inc.*, 831 So.2d 727, 735 (Fla.Dist.Ct.App. 2002); *Indian Harbor Citrus, Inc. v. Poppell*, 658 So.2d 605, 606 (Fla.Dist.Ct.App. 1995); *J.C. Penny Co., Inc. v Koff*, 345 So.2d 732, 735 (Fla.Dist.Ct.App. 1977).

Based on the foregoing, the court grants in part SSC's request for a partial summary judgment determining "that at all CCTV products marketed by Sensormatic are included with the scope of SSC's Franchise Agreement and the Settlement Agreement, without regard to the type of customer to whom such products are sold, or the brand name under which such products are sold." (Paper 202, at 4).  The court determines that CCTV products marketed by Sensormatic are within the scope of the Franchise Agreement and Settlement Agreement to the extent that the product is used for the prevention and detection of shoplifting and other theft.  The court further grants in part and denies in part Sensormatic's cross-motion for summary judgment that:

> (1) SSC has no franchise rights regarding any
> of the CCTV products sold during the

27

> limitations period and no rights to CCTV
> products going forward . . .
>
> (2) even if SSC has some franchise rights to
> some current CCTV products sold within the
> limitations period, CCTV sales to non-retail
> users do not implicate SSC's franchise rights
> . . . .

(Paper 210, at 5).  Specifically, the court denies Sensormatic's cross-motion to the extent that Sensormatic seeks a determination that SSC has no franchise rights regarding CCTV products.  The court grants Sensormatic's cross-motion and determines that CCTV sales to non-retail users do not implicate SSC's franchise rights, provided that the customer is not using the product for the prevention and detection of shoplifting and other theft.

**C.   Violation of the Franchise Agreement by Authorizing Third Parties to Sell Sensormatic Equipment (Count I)**

SSC seeks a declaration that Sensormatic breached the Franchise Agreement by authorizing ADT, Wallace, and other dealers and distributors to sell and service Sensormatic EAS and CCTV products within SSC's franchise territory.  (Paper 202, at 4).  The declaration SSC seeks pertains to Count I of the Second Amended Complaint.

To establish a breach of contract claim, SSC must show (1) a valid contract, (2) a material breach, and (3) damages.  *See Med. Jet, S.A. v. Signature Flight Support-Palm Beach, Inc.*, No. 4D05-1760, __ So.2d __, 2006 WL 1083940, at *1 (Fla.Dist.Ct.App. Apr. 26, 2006); *J.J. Gumberg Co. v. Janis Servs., Inc.*, 847 So.2d 1048,

1049 (Fla.Dist.Ct.App. 2003); *Abbott Labs., Inc. v. Gen. Elec. Capital*, 765 So.2d 737, 740 (Fla.Dist.Ct.App. 2000).

Sales by third parties implicate two sections of the Franchise Agreement: § 9(c), which addresses SSC's rights within its territory, and § 10, which addresses sales to national accounts. Section 9(c) of the Franchise Agreement provides:

> Except as otherwise provided in this Agreement or as otherwise agreed to in writing between the parties hereto, the Franchisor shall not during the term of this Agreement compete with the Franchisee and *the Franchisor shall not grant to any third party a franchise or other right to sell, lease or service Equipment in the Franchisee's Territory*.

(emphasis added). Thus, the elements of a violation of § 9(c) are: (1) granting a third party; (2) a franchise or other right to sell, lease or service; (3) Equipment as defined in the Franchise Agreement; and (4) in SSC's territory.

Section 10 provides:

> Notwithstanding anything to the contrary contained in this Agreement, the Franchisor shall have the right to lease, sell or otherwise distribute Equipment to national accounts for use either within or without the Franchisee's Territory, and to contract for service, repair and maintenance in connection therewith, provided that in the event of any such leases or sales to or contracts with national accounts or with respect to Equipment for use in the Franchisee's Territory, the Franchisee shall be entitled to commissions as set forth in Section 7 hereof.  For purposes of this Agreement, a "national account" shall mean any customer, or potential customer, or any person or entity who or which controls, or is controlled by, or is under common control

29

> with, such customer, or the Franchisor or
> Franchisee who or which has leased or
> purchased or may lease or purchase products
> for use in more than one state or territory.

SSC contends that ADT, Wallace, and other dealers and distributors have sold and/or serviced SSC's products within SSC's franchise territory, in violation of the Franchise Agreement.

**1. ADT**

**a. SSC's Motion for Summary Judgment**

SSC contends that Sensormatic has permitted ADT to sell Sensormatic EAS and CCTV products in SSC's territory after Sensormatic was acquired by Tyco, and this authorization violates the Franchise Agreement.  (Paper 202, at 47-51).  The authorization included sales to both national and local customers.  Sensormatic responds that there was no breach of the Franchise Agreement with respect to CCTV products because CCTV is not covered by the franchise.  With respect to EAS sales, Sensormatic argues that it has the right to make national sales pursuant to § 10, and that right includes the authority to make such sales through an agent (i.e., ADT).  (Paper 210, at 35).

SSC has failed to provide uncontroverted evidence that ADT is a third party.  The elements of an agency relationship under Florida law are: "1) acknowledgment by the principal that the agent will act for him or her, 2) the agent's acceptance of the undertaking, and 3) control by the principal over the actions of the agent."  *Font v. Stanley Steemer Int'l, Inc.*, 849 So.2d 1214,

30

1216 (Fla.Dist.Ct.App. 2003).  "It is the right to control, rather than actual control, that may be determinative." *Villazon v. Prudential Health Care Plan, Inc.*, 843 So.2d 842, 853 (Fla. 2003); *see also Font*, 849 So.2d at 1216 (stating that "[w]hether one party is a mere agent rather than an independent contractor as to the other party is to be determined by measuring the right to control and not by considering only the actual control exercised by the latter over the former").  Whether an agency relationship exists is "normally one for the trier of fact to decide." *Villazon*, 843 So.2d at 853. *See also Goldschmidt v. Holman*, 571 So.2d 422, 424 (Fla. 1990);  *Font*, 849 So.2d at 1216.

The existence of a written agreement that defines the relations between the contracting parties is not automatically determinative. *See Villazon*, 843 So.2d at 854 ("It is not uncommon for parties to include conclusory statements in documents with regard to the independence of the relationship of the parties. This may occur even when other contractual provisions and the totality of the circumstances reflect otherwise."); *Parker v. Domino's Pizza, Inc.,* 629 So.2d 1026, 1027 (Fla.Dist.Ct.App. 1993) (stating that the nature of the relationship is not controlled by the labels the parties use).

SSC provides the following evidence that the relationship between Sensormatic and ADT is one of vendor-vendee, not one of agency.  Kenneth Chmiel, vice president of operations for

31

Sensormatic, stated in a deposition that ADT is considered to be a customer of Sensormatic (paper 202, ex. P, 118:22-119:11, June 18, 2002).  Lawrence Dzubeck, a Tyco executive, stated that Sensormatic does not direct ADT's sales, ADT decides to whom it will sell Sensormatic products, ADT sets the price of the product, and when a customer agrees to buy a product, the customer reaches the agreement with ADT, not Sensormatic.  (Paper 202, ex. GG, Dzubeck dep., 41:3-42:7, Mar. 30, 2004).

In response, Sensormatic proffers an agency agreement between Sensormatic and ADT dated October 18, 2004.[13]  The agency agreement states that:

> [S]ince 2002, ADT has acted on behalf of Sensormatic as its agent with respect to (i) selling, leasing, distributing, advertising, promoting, marketing, maintaining, repairing, servicing and billing and collecting third-party payments on . . . Sensormatic products throughout the United States and (ii) all of ADT's dealings with franchisees of Sensormatic, including compliance on behalf of Sensormatic with Sensormatic franchise agreements . . .

(Paper 210, ex. 14).  The agency agreement further provides: "ADT shall follow all policies, procedures, guidelines and directions it receives from Sensormatic from time to time."  *Id.*  Sensormatic also proffers evidence that many ADT employees are former Sensormatic employees who perform the same tasks for ADT that they

---

[13] The agency agreement was signed approximately 2½ years after SSC filed its complaint on April 30, 2002.

32

performed for Sensormatic.  (Paper 210, Davell decl., ¶ 11).  The evidence thus creates a question of material fact, and SSC is not entitled to summary judgment in its favor.

Moreover, SSC is incorrect in arguing that Sensormatic may not authorize ADT, as a third party, to sell to national accounts.  *See* (paper 202, at 49).  Although the Franchise Agreement prohibits Sensormatic from authorizing third parties to sell directly to customers in SSC's territory, it does not prohibit Sensormatic from selling to third parties that then sell to national accounts.  *See* paper 202, ex. A, § 9(c); *see also* Part III.C.3 *infra*.  An authorization allowing third parties to sell products to national accounts would not violate the Franchise Agreement.[14]

Thus, SSC has not shown that it is entitled to a declaration that Sensormatic breached the Franchise Agreement by authorizing ADT to sell Sensormatic products.

**b. Sensormatic's Cross-Motion for Summary Judgment**

Sensormatic contends that it is entitled to summary judgment on the breach of contract claim regarding the authorization of sales by ADT.  As discussed previously, there is a question of fact as to whether ADT is an agent of Sensormatic, thereby precluding summary judgment.  Moreover, the evidence is not entirely clear as to whether the disputed sales were made to national or non-national

---

[14] The parties do not address, and the court does not reach the question of whether Sensormatic owes commissions on sales made to third parties that then sell to national accounts.

accounts.  Finally, to the extent that Sensormatic argues that CCTV sales to non-retail customers are outside the scope of the Franchise Agreement (paper 210, at 34), Sensormatic is incorrect. *See* Part III.B.  Accordingly, Sensormatic's cross-motion will be denied.

**2. Wallace**

**a. SSC's Motion for Summary Judgment**[15]

SSC seeks a determination that Sensormatic breached § 9(c) of the Franchise Agreement by authorizing Wallace to sell labels and label products within SSC's franchise territory.  Sensormatic has provided no argument in response.  In the Wallace License Agreement, Sensormatic authorized Wallace to manufacture Ultra•Max labels using Sensormatic technology, to sell these labels within the United States (without any geographic limitations), and to use the Sensormatic trademarks in connection with the marketing and sale of these labels.  (Paper 202, ex. M; paper 68, ¶ 26).  The Wallace License Agreement also makes reference to the Franchise Agreement between SSC and Sensormatic, and SSC's exclusive rights therein.  (Paper 202, ex. M., schedule 3).

SSC has provided sufficient uncontroverted evidence that it is entitled to judgment as a matter of law.  First, Wallace is a third

---

[15] Sensormatic has not cross-moved for summary judgment with respect to SSC's claim that Sensormatic breached the contract claim by authorizing Wallace, a third party, to sell Sensormatic products within SSC's franchise territory.

party based on the Wallace License Agreement, which expressly states that "each party shall be an independent contractor, and not an agent, partner or joint venturer of the other." (Paper 202, ex. M, § 10). Moreover, Sensormatic has provided no argument or evidence that it exerted any control over Wallace, which would make Wallace its agent. *See Villazon,* 843 So.2d at 853 ("[I]t is the right to control, rather than actual control, that may be determinative"). Second, the licensing agreement grants Wallace the right to sell Base Labels and Label Products.[16] (Paper 202, ex.

---

[16] The license agreement defines a Base Label as:

> [A] self-contained device consisting of amorphous soft magnetic material, semi-hard magnetic bias material and a housing for such materials, which is adapted to resonate mechanically at a desired frequency in an incident magnetic field and to undergo detectable magnetic changes during such resonance from which only confirmation of the presence of an active such device in the field can be derived (i.e., "single bit" information), which device can be activated or deactivated by means of a change in state of the bias material contained therein, and which device embodies inventions described in Patent Rights.

(Paper 202, ex. M, § 1). The agreement defines a Label Product as:

> [A] Base Label, or a label or tag with a Base label incorporated therein or attached thereto, which is sold or otherwise disposed of to third parties by Wallace for attachment to or incorporation in an End Product or its packaging, but does not include a Hard Tag.

*Id.* The agreement defines End Product as: "(i) any item of
(continued...)

M, § 2(a)).  With respect to the third element, the Franchise
Agreement defines Equipment as "all Detection Devices, Tags,
Accessories and Supplies." (Paper 202, ex. A, § 1(d)).  The term
"Tags" is defined as "tags, *labels*, sensors, transponders and
sensor-emitters and the like, marketed by the Franchisor for
Automatic Theft Detection Uses, which may be attached to or
included in merchandise, goods, articles and objectors for use in
conjunction with Detection Devices."  *Id.* at § 1(b) (emphasis
added).  Fourth, SSC has presented evidence that the Franchise
Agreement related to SSC's franchise territory.  The license
agreement permits Wallace to sell Base Labels and Label Products .
. . in the Territory."  *Id.* at § (c)(i).  Territory is defined as
"the fifty states of the United States of America and the District
of Columbia."  *Id.* at § 1.  Wayne E. Richter, a senior vice
president at Wallace, testified that Sensormatic never restricted
Wallace's ability to sell in SSC's territory and that Sensormatic
expected Wallace to contact such customers. (Paper 202, ex. L, at
50, 88).  Finally, to establish a breach of contract claim, SSC
must show damages.  SSC presented the testimony of Wayne E.
Richter, a Wallace executive, who admitted to making sales of Base
Labels to customers in SSC's franchise territory. (Paper 202, ex.

---

[16](...continued)
merchandise to be sold at retail to consumers and (ii) any other
item mutually agreed in writing by Wallace and Sensormatic to be an
End Product."  *Id.*

L., 53:9-13, June 6, 2002).  SSC also proffered the testimony of a Douglas Thomas who stated that Europac, a company that formerly purchased labels from SSC, began purchasing from Wallace.  (Paper 202, ex. CCC, 74:12-22, July 30, 2003).

Accordingly, the court will grant SSC's motion for summary judgment on its breach of contract claims with respect to Wallace.

## 3. Other Dealers and Distributors

### a. SSC's Motion for Summary Judgment

SSC contends that Sensormatic authorized more than 100 dealers and distributors to sell Sensormatic's EAS and CCTV products within SSC's franchise territory in violation of § 9(c) of the Franchise Agreement.  (Paper 202, at 46).

With respect to the EAS products, SSC alleges that Sensormatic authorized eight companies ("label distributors") to distribute EAS labels throughout the United States.[17]  (Paper 202, ex. Y).  In

---

[17]  The eight companies identified in exhibit Y are Avery Dennison Worldwide Ticketing Services, B & G Plastics Worldwide, Dunwiddie Custom Packaging, Labeltronix, Omni Systems, Shrink Packaging Systems, Slate Marketing, Inc., and WS Packaging Group.

The parties refer to these eight companies as "source taggers."  In an affidavit, Thomas F. Racette, the Director of United States Source Tagging for ADT Security Services, Inc., who previously worked for Sensormatic, states that a source tagger is a:

> company that purchases Sensormatic EAS labels and applies them to products or packaging during the manufacturing or packaging process. Once the products or packing materials have been labeled by these source taggers, they are distributed to retail locations and
> (continued...)

support, SSC has proffered copies of agreements with four companies

to distribute EAS labels: Omni Systems, WL Group, Slate Packaging,

and Mainetti/B&G Plastics, Inc.[18]   (Paper 202, ex. AA).   The

agreements allow these companies to sell EAS labels to

manufacturers or suppliers to manufacturers that are engaged in

source tagging; there are no geographical restrictions in the

agreements on these sales.  *Id.*  In addition, these companies are

authorized to sell a particular type of label, the RF label, to

retail accounts, although they are excluded from selling the RF

labels to retail accounts in the District of Columbia, Maryland,

and Virginia.  *Id*.  SSC also produced copies of seventeen invoices

that demonstrate the sale and shipment of Sensormatic products from

Shrink Packaging to a company in Virginia, Medco Security Locks,

Inc.[19]  (Paper 202, ex. BB).

Sensormatic responds that the distribution of EAS labels to

label distributors is governed by a separate agreement (paper 210,

ex. 15), and that it has not breached this agreement.  (Paper 210,

at 38).  The agreement Sensormatic cites consists of a letter from

_____

[17](...continued)
        distribution centers through the country for
        sale to consumers.

(Paper 210, Racette decl., ¶ 4).

   [18] WL Group is not on the list of companies in exhibit Y.

   [19] Exhibit BB, which SSC provided, also includes a chart titled
Sensormatic Report - February, 2003, but SSC has provided no
explanation as to what this chart purports to show.

Sensormatic to Michael Epstein, President of SSC, dated August 23, 1994, which establishes a formula for estimating commissions due to SSC based on the sale of source-tagged labels in SSC's territory. Section 20 of the Franchise Agreement expressly prohibits such an informal amendment: "No contemporaneous or subsequent representations, warranties or agreements shall waive, modify or amend this Agreement unless made in writing and executed with the same formalities as this Agreement." Nothing in the August 23, 1994, letter suggests that the parties intended it to be an agreement to amend the Franchise Agreement. The letter merely resolves questions about Sensormatic's obligations under the Franchise Agreement by establishing a method for calculating the commissions owed to SSC under the Franchise Agreement. The evidence does not show, therefore, that the distribution of EAS labels to label distributors is governed by a separate agreement.

Nevertheless, SSC has failed to show that Sensormatic violated § 9(c) because the evidence provided by Sensormatic indicates that the label distributors sold to national account customers. Specifically, the evidence shows that the label distributor's role is to purchase the Sensormatic labels and apply them to products or packaging during the manufacturing or packaging process, so that the products can be distributed to retail locations and distribution centers nationally. (Paper 210, Racette decl., ¶¶ 2-6). SSC concedes that the label distributors sold the labels to

39

national accounts.   (Paper 214, at 31).   SSC asserts that
"[n]either the letter nor Section 10 itself says that the
Franchisor may authorize third-party dealers and distributors to
make sales to national accounts for use in SSC's Territory."  SSC
then concludes that "where Section 10 does not apply, Section
9(c)'s provision which otherwise prohibits Sensormatic from making
or authorizing sales in the Franchise Territory comes into play."
*Id.*  SSC's logic does not automatically follow.  As discussed in
the previous section relating to ADT, although the Franchise
Agreement prohibits Sensormatic from authorizing third parties to
sell directly to customers in SSC's territory, it does not prohibit
Sensormatic from authorizing third parties to sell to national
accounts.  It follows, then, that to the extent that Sensormatic
authorized the label distributors to sell labels to national
accounts, such authorization does not violate the Franchise
Agreement.

The evidence supports this analysis.  First, the August 23,
1994, letter indicates that both parties believed that Sensormatic
owed commissions to SSC for source-tagged labels sold in SSC's
territory; the primary issue was how to calculate the commission.
Nothing in this letter suggests that there was any dispute as to
whether these sales into SSC's franchise territory were proper in
the first place.  Second, the evidence shows that SSC has been
ready to speak up when it believed Sensormatic breached the

40

Franchise Agreement.  In October 2001, for instance, SSC sent Sensormatic a letter objecting to the lack of commissions with respect to the CCTV sales and the Wallace sales in its territory. (Paper 202, ex. X, at 2).  The letter also made reference to the commissions for source-labeled products and reminded Sensormatic that it needed to prepare regular updates - but did not object to the sales.  Third, Epstein, the president of SSC, stated in a deposition: "If it's a national account and products come into my area where the labels are already inserted on a product and they come in my area, that is permitted and I need to get my sales rep - my sales commission."  (Paper 210, Epstein dep., 90:12-16, May 30, 2002).  Thus, to the extent that label distributors were authorized to sell to national accounts, such authorization does not violate the Franchise Agreement.

Finally, SSC has provided evidence in the form of invoices that a third party label distributor, Shrink Packaging, directly sold Sensormatic products to a company in Virginia.  As a threshold matter, SSC has not produced an agreement to show that Sensormatic granted to Shrink Packaging the right to sell labels.  The invoices are insufficient to show that Sensormatic gave Shrink Packaging authority to sell in SSC's territory.  *See* (paper 202, ex. A, § 9(c)).

With respect to the CCTV products, Sensormatic admits it authorized 102 dealers and distributors to sell CCTV products, and

it authorized 55 of these companies to install and service certain
CCTV products.[20]  (Paper 102, exs. Q, R).  Sensormatic contends that
CCTV products are not covered by the Franchise Agreement and
Settlement Agreement, and therefore, there was no breach of the
Franchise Agreement.  (Paper 210, at 37).  Because the court has
found that the Settlement Agreement amended the Franchise Agreement
to add Sensormatic's future CCTV products (as well as the
SensorVision System) that are used for shoplifting and other theft
detection, Sensormatic's argument lacks merit.  Sensormatic has
provided no additional argument on this issue.

Sensormatic does not dispute SSC's assertion that the 102
third party dealer/distributors that sold, installed, and serviced
CCTV products in SSC's territory are third parties.  Sensormatic
also admitted that it authorized these dealers/distributors to sell
certain CCTV products.  (Paper 202, ex. R, Q).  CCTV products are
within the scope of the Franchise Agreement so long as they are
used for the purpose of detecting theft.  SSC has provided no
information as to whether the CCTV products at issue here involved
CCTV products for the purpose of detecting theft.  Accordingly, SSC
is not entitled to summary judgment with respect to the dealers and

---

[20] Exhibit Q refers to video equipment sales generally. Exhibit
R refers specifically to CCTV products.  Exhibit Q states that it
supplements the list of dealers and distributors in Exhibit R,
therefore the court will presume that video equipment sales refers
to CCTV products.

distributors that were authorized to sell, install and service CCTV products.[21]

b. **Sensormatic's Cross-Motion for Summary Judgment**

Sensormatic asserts that it is entitled to summary judgment regarding the authorization of sales by label distributors. As discussed previously, granting the eight label distributors the right to sell labels to national accounts does not violate the Franchise Agreement. Although the invoices from Medco Security Locks indicate that a label distributor may have sold labels directly to a customer in Virginia, SSC has not shown that Sensormatic authorized Medco to sell these labels. The court, therefore, will grant Sensormatic's cross-motion for summary judgment with respect to the label distributors.

Sensormatic also argues it did not breach the Franchise Agreement by authorizing 102 dealers/distributors to sell CCTV products because CCTV products are not within the scope of SSC's rights. Because Sensormatic is incorrect on this point but the evidence does not indicate whether the CCTV sales involved sales for theft-related uses, it is not entitled to summary judgment with respect to CCTV sales by the 102 dealers/distributors.

---

[21] Sensormatic makes a brief reference to sales to non-retail customers: "Sensormatic did not breach the RFA by authorizing dealers and distributors to sell CCTV to non-retail customers." Sensormatic fails to present any arguments or evidence to suggest that the sales of the CCTV products with respect to these dealers and distributors were for non-retail purposes.

**D.    Tortious Interference with a Business Contract Against Wallace**

In Count VI, SSC brings a tortious interference with contract claim against Wallace based on the Wallace License Agreement with Sensormatic to sell labels and label products.  SSC claims that Wallace knew of the existence of SSC's Franchise Agreement, and that Wallace intentionally induced Sensormatic to grant it authorization to sell Sensormatic Equipment in SSC's territory. Wallace raises several arguments in opposition: (1) SSC's claim against Wallace is time barred; (2) it did not have knowledge of the Franchise Agreement and did not intend to cause its breach; and (3) Wallace did not induce Sensormatic to breach the Franchise Agreement.

**1.    Statute of Limitations**

SSC's Second Amended Complaint, filed August 8, 2002, alleges that Wallace entered into a license agreement with Sensormatic on February 11, 1997.  Wallace argues that the claim is outside the three-year statute of limitations for tortious interference claims because SSC admitted that it learned of sales by Wallace in 1999, if not earlier.

Under Maryland law, a civil action "shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action

44

shall be commenced."[22]   Md. Code. Ann., Cts. & Jud. Proc. § 5-101

(2002).  Section 5-101 analysis is subject to the "discovery rule,"

which states that "the cause of action accrues when the claimant in

fact knew or reasonably should have known of the wrong."[23]

_____

[22] Although the Franchise Agreement requires application of Florida law with respect to the dispute between SSC and Sensormatic, Maryland law applies to the tortious interference claims against Wallace and ADT.  *See Integral Nuclear Assocs. v. Nair*, No. Civ. JFM-0502662, 2005 WL 3481353, at *2 n.1 (D.Md. Dec. 20, 2005)("Plaintiff argues that Pennsylvania law should apply to the tortious interference claim, but that is mistaken. Pennsylvania law governs the claims based on the contracts between the parties, but the tortious interference claims do not arise out of those contracts.  The alleged tortious interference conduct occurred in Maryland, and as such, Maryland tort law applies."). The law is unclear, however, in a case such as this where it is possible that the tort occurred in more than one state (Maryland, District of Columbia and/or Virginia).  In *Hardwire LLC v. Goodyear Tire & Rubber Co.*, 360 F.Supp.2d 728, 733 (D.Md. 2005), Judge Bennett raised this issue in a case involving tortious interference with economic advantage, and chose to certify the question to the Court of Appeals of Maryland.  That certification was later withdrawn, when the parties settled the matter.  However, the law in the District of Columbia and Virginia does not differ significantly from Maryland law with respect to tortious interference with a contract.  In the present case, SSC, a Virginia corporation with its principal place of business in Rockville, Maryland, asserts that Maryland is where the harm occurred and that Maryland law applies.  (Paper 202, at 51 n. 51).  The Defendants do not dispute that Maryland law applies and have not objected to the application of Maryland law.

[23] Under District of Columbia law, the statute of limitations for claims of tortious interference with a contract is three years. *See Jankovic v. Int'l Crisis Group*, No. CIV A104cv01198 RBW, 2006 WL 1134481, at *3 n.2 (D.D.C. May 1, 2006) ("Causes of action neither specified by the Code nor intertwined with specified causes are subject to the District of Columbia's three-year limitations period.  D.C. Code Ann. § 12-301 (8) (2001).")  Under Virginia law, the statute of limitations for claims of tortious interference with a contract is five years.  *Whitaker v. Sheild*, No. 4:05cv130, 2006 WL 1321481, at *8 (E.D.Va. May 3, 2006); *see also Worrie v. Boze*,
(continued...)

*Poffenberger v. Risser,* 290 Md. 631, 636 (1981); *see also Hecht v. Resolution Trust Corp.*, 333 Md. 324, 334 (1994) (stating that the discovery rule applies generally in all civil actions and "provides that a cause of action accrues when a plaintiff in fact knows or reasonably should know of the wrong"). Generally, "the party raising a statute of limitations defense has the burden of proving that the cause of action accrued prior to the statutory time limit for filing the suit." *Newell v. Richards*, 323 Md. 717, 725 (1991). Ordinarily, "defendants will have the burden to both plead and prove the statute as an affirmative defense." *Id*. (citing Maryland Rule 2-323(g)(16) (requiring defendant to plead specially the limitations defense)).

Wallace contends that SSC discovered the alleged tort in 1999 based on an interrogatory response in which SSC stated that it became aware in 1999 that Wallace was selling Sensormatic labels in its territory. (Paper 210, ex. 30, at 5). In addition, Douglas Thomas, who works for SSC, stated in a deposition that a customer made SSC aware in 1999 that Wallace was selling labels. (Paper 210, Thomas dep., 51, Mar. 31, 2004). The parties cannot say whether this knowledge occurred before August 8, 1999 (i.e., three years before the Second Amended Complaint was filed). Thomas

---

[23](...continued)
95 S.E.2d 192, 195-96 (Va. 1956) (holding that a statute of limitations of five years applies to wrongs done to property rights, such as "the right to performance of a contract and the right to reap profits therefrom.")

further testified that SSC knew who Wallace was and knew that Sensormatic was selling labels to Wallace, *id*. at 55, that he had spoken to Epstein, the president of SSC, about Wallace manufacturing and selling Sensormatic labels "about four years ago" (the testimony took place in June 2002) (paper 210, Thomas dep. 129:24-130:1, June 4, 2002), and that he had heard that Sensormatic was in discussions with Wallace and Avery Dennison regarding licensing and selling Ultra•Max labels "five, six, seven years ago" (the testimony took place March 31, 2004)(paper 210, Thomas dep. 11:17-22, 21:18-22:7, Mar 31, 2004).  Finally, Wallace points out that Sensormatic issued a press release in February 1997 regarding the Wallace License Agreement.

Wallace has failed to meet its burden of proof on the statute of limitations defense.  Although SSC concedes it was on notice in 1999, the interrogatory Wallace relies on does not state when in 1999 SSC learned of possible Wallace sales in its territory. Moreover, Thomas' testimony is insufficient to "remove genuine doubt from the issue altogether," see *Hoover Color Corp*. v. *Bayer Corp*., 199 F.3d 160, 164 (4th Cir. 1999) (internal quotation marks omitted), *cert. denied*, 530 U.S. 1204 (2000).  With respect to the press release, Wallace has provided no information as to whether Sensormatic or Wallace sent a copy of the press release to SSC, how

the press release was distributed, to whom it was distributed, and
how widely it was distributed.[24]

## 2.   Analysis of the Claim

Sensormatic has moved for summary judgment on its tortious
interference with a contract claim against Wallace (Count VI), and
Wallace has cross-moved for summary judgment in its favor.  Wallace
contends that it is not liable because Wallace did not know it was
interfering with the Franchise Agreement and Wallace did not induce
Sensormatic to breach the Franchise Agreement.

The elements of tortious interference with contract under
Maryland law are:

> (1) existence of a contract between plaintiff
> and a third party; (2) defendant's knowledge
> of that contract; (3) defendant's intentional
> interference with that contract; (4) breach of
> that contract by the third party; and (5)
> resulting damages to the plaintiff.[25]

---

[24] Because Wallace has failed to meet its burden of proof on
the statute of limitations defense, the court does not address
SSC's argument that Wallace's repeated sales constituted a
continuing violation.

[25] The District of Columbia and Virginia have the same or
similar elements for tortious interference with a contract.  The
elements under District of Columbia law are: (1) a legal contract
existed; (2) the defendant had knowledge of the contract; (3) the
defendant intentionally procured the contract's breach; and (4)
damages resulted from the defendant's actions.  *Bannum, Inc. v.
Citizens for a Safe Ward Five, Inc.*, 383 F.Supp.2d 32, 43 (D.D.C.
2005). The elements under Virginia law are: (1) the existence of a
valid contractual relationship or business expectancy; (2)
knowledge of the relationship or expectancy on the part of the
interfering party; (3) intentional interference inducing or causing
a breach or termination of the relationship or expectancy; and (4)
(continued...)

*Fowler v. Printers II, Inc.*, 598 A.2d 794, 802 (Md.App. 1991) (internal citations omitted). "The tort . . . is committed when a third party's intentional interference with another in his or her business or occupation induces a breach of an existing contract or, absent an existing contract, maliciously or wrongfully infringes upon an economic relationship." *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 297 (1994)(internal citation omitted). *See also Sharrow v. State Farm Mut. Auto. Ins. Co.*, 306 Md. 754, 763 (1986) (stating that the tort "may arise where intentional interference by a third party with another in his business or occupation induces a breach of an existing contract"); *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 69 (1984)(stating that "the two general types of tort actions for interference with business relationships are inducing the breach of an existing contract and, more broadly, malicious or wrongfully interfering with economic relationships in the absence of a breach of contract").

The parties do not dispute the first element, the existence of a contract.  The parties dispute the second element as to whether Wallace knew of the Franchise Agreement.  The Restatement (Second) of Torts provides:

---

[25](...continued)
resulting damages to the party whose relationship or expectancy has been disrupted. *Whitaker v. Sheild*, No. 4:05cv130, 2006 WL 1321481, at *10 (E.D. Va. May 3, 2006) (citing *Rappahannock Pistol & Rifle Club v. Bennett*, 546 S.E.2d 440, 444 (Va. 2001)).

> [T]he actor must have knowledge of the
> contract with which he is interfering *and of*
> *the fact that he is interfering with the*
> *performance of the contract*. Although the
> actor's conduct is in fact the cause of
> another's failure to perform a contract, the
> actor does not induce or otherwise
> intentionally cause that failure if he has no
> knowledge of the contract. But it is not
> necessary that the actor appreciate the legal
> significance of the facts giving rise to the
> contractual duty, at least in the case of an
> express contract. If he knows those facts, he
> is subject to liability even though he is
> mistaken as to their legal significance and
> believes that the agreement is not legally
> binding or has a different legal effect from
> what it is judicially held to have.

Restatement (Second) of Torts § 766 cmt. i (emphasis added). SSC
points out that the Franchise Agreement specifically includes
Schedule 3, which refers to SSC's Franchise Agreement. On the same
day the Wallace License Agreement was signed, Wallace received a
letter for additional indemnification from Sensormatic "from and
against any Damages arising out of or resulting from any claims
asserted by SSC against Wallace arising under or relating to the
Franchise Agreement." (Paper 202, ex. N). In addition, Steve
Carson, the former General Counsel for Wallace, was asked whether,
after signing the Wallace License Agreement, he believed that
Wallace had the right to sell Sensormatic labels in the D.C. area.
Carson answered: "I don't believe so." (Paper 202, Carson dep.,
49:10-14, Aug. 10, 2003).

Wallace responds that it was never informed precisely of SSC's
rights, and that it never saw a copy of the Franchise Agreement.

(Paper 210, Carson dep., 22:12-14, Aug. 5, 2003; Richter dep., 66:16-21, June 6, 2002).    It also presents evidence that Sensormatic told Wallace that there was a dispute between SSC and Sensormatic but that the dispute was being worked out.  (Paper 210, Carson dep. 46:19-47:1, Aug. 5, 2003).  Wallace further argues that the Wallace License Agreement was crafted to ensure the parties would have flexibility to adjust the terms if necessary to avoid a breach of the Franchise Agreement.   For instance, the Wallace License Agreement authorizes Wallace to sell anywhere in the United States "subject to any rights of third parties." (Paper 202, ex. M, at 4).   The determination as to whether the Wallace License Agreement would have an effect on the Franchise Agreement was left to Sensormatic.  (Paper 210, Richter dep., 92:22-24, June 6, 2002).

Taking this evidence in the light most favorable to Wallace as the non-moving party for purposes of SSC's partial summary judgment motion, the issue of whether Wallace had knowledge of the Franchise Agreement is a question of material fact for the fact-finder.  *See* Fed.R.Civ.P. 56(c).  *See also Holmes Prods. Corp. v. Dana Lighting, Inc.*, 958 F.Supp. 27, 32 (D.Mass. 1997)(stating that the question of the defendant's knowledge of the contract in a tortious interference claim raised a genuine issue of material fact); *Towe Farms, Inc. v. Cent. Iowa Prod. Credit Ass'n*, 528 F.Supp. 500, 507 (1981)(same).  Conversely, viewing the evidence in the light most favorable to SSC as the non-moving party for purposes of Wallace's

51

summary judgment motion, a question of fact exists, thereby precluding summary judgment in Wallace's favor.

The third element, intentional interference with the contract, also presents a question of fact. SSC contends that Wallace induced a breach by offering better terms to Sensormatic. (Paper 202, at 55). SSC points out that the agreement between Wallace and Sensormatic allowed Sensormatic to avoid paying SSC a commission of 40% of gross revenues received from label sales in SSC's territory. The Court of Appeals has recognized that offering attractive terms is a method by which a third party may induce a party's breach of the contract.[26] *See Cumberland Glass Mfg. Co. v. De Witt,* 120 Md. 381, 393 (1913). *See also Prudential Real Estate*, 2000 WL 248170, at *6 (4th Cir. 2000)(unpublished); Restatement (Second) of Torts § 766 cmt. m ("Another method of inducing B to sever his business relations with C is to offer B a better bargain that which he had with C.").

Wallace responds that it did not know of the terms in SSC's agreement, and therefore it could not have knowingly made a better offer in order to induce a breach. (Paper 211, at 10). Wallace also presents evidence that Sensormatic independently approached several companies as potential business partners to help manufacture labels. (Paper 211, at 8). Specifically, Wallace

---

[26] District of Columbia and Virginia neither expressly recognize nor expressly contradict this application made by the Court of Appeals.

cites a 1996 inter-office memo in which a Wallace representative noted that Sensormatic had spoken with two companies in addition to Wallace, and the deposition testimony of Douglas Thomas, who stated that Sensormatic wished to provide retail trade organizations with an alternative label source.  (Paper 210, Thomas dep., 12:1-15, Mar. 31, 2004).  Thomas testified, however, that he was unsure whether it was Wallace's idea or Sensormatic's idea to have a second supplier of labels.  *Id.* at 11:9-10 ("I don't know if it was Wallace's idea first or Sensormatic's idea first.").

Thus, the issue of whether Wallace intentionally interfered in the Franchise Agreement by inducing Sensormatic to breach the Franchise Agreement is a question of material fact that a jury must resolve.  *See Cumberland*, 120 Md. at 394; *Prudential Real Estate*, 2000 WL 248170 at *6-*7; *Holmes Prods. Corp.,* 958 F.Supp. at 32 (holding that, in a tortious interference claim, the intent to interfere in a contract raised a genuine issue of material fact); *Towe Farms,* 528 F.Supp. at 507(same).  Because the evidence creates a question of fact, neither party is entitled to summary judgment with respect to the tortious interference claim against Wallace (Count VI).

## E.    Tortious Interference with a Business Contract Against ADT

SSC asserts that after Tyco acquired Sensormatic, various sales divisions of ADT have sold and serviced Sensormatic products to customers in SSC's territory.  SSC claims that ADT interfered

with SSC's Franchise Agreement with Sensormatic by inducing Sensormatic to grant it authorization to sell and service Sensormatic products (EAS and CCTV) in SSC's territory.

Before Tyco acquired Sensormatic, ADT and Sensormatic operated in the same or overlapping markets. Sensormatic was strong in the EAS market, and ADT was strong in the security market. (Paper 202, ex. CC, Brisgone dep. I, 112:12-20, June 25, 2002). Chmiel, the vice president of operations for Sensormatic, testified that Sensormatic authorized Intelligent Marketing to set up a network of dealers and distributors to sell Sensormatic CCTV products in Maryland, the District of Columbia, and Virginia.[27] (Paper 202, ex. P, Chmiel dep., 50:10-53:2, June 18, 2002). ADT was among the entities that were authorized to sell CCTV products. (Paper 210, Davell decl., ¶ 4).

The Tyco acquisition of Sensormatic had a significant effect on how Sensormatic sold its products to customers. On August 3, 2001, Tyco Acquisition Corp. XXIV (NV) ("TAC"), one of Tyco's wholly owned subsidiaries, executed an Agreement and Plan of Merger with Sensormatic.[28] (Paper 210, Rogers decl., ¶ 4). Pursuant to

---

[27] Chmiel testified that Intelligent Marketing is a manufacturing representative. As such, Intelligent Marketing encourages dealers and distributors to use Sensormatic products, and it helps the dealers and distributors develop bids and demonstrations for the Sensormatic products. (Paper 202, ex. P, Chmiel dep., 52:14-53:2, June 18, 2002).

[28] Tyco is a publicly traded holding company for a large number (continued...)

the agreement, TAC acquired all of Sensormatic's stock, Sensormatic merged into TAC, and TAC continued as the surviving corporation. TAC then changed its name to Sensormatic Electronics Corporation.[29] *Id.* Sensormatic is the successor to the Franchise Agreement with SSC. "Section 1.06 of the Merger Agreement between TAC (which was both the Acquiror and the Surviving Corporation), and Sensormatic provided 'the Surviving Corporation shall possess all the property, rights, privileges, powers and franchises of Acquiror and the Company, and shall be subject to all debts, liabilities and duties of Acquiror and the Company.'" (Paper 210, Rogers decl., ¶ 5). After the acquisition, Sensormatic was placed within the Tyco Safety Products group, an unincorporated business organization within the Tyco Fire and Security division. However, Sensormatic's field organization, consisting of the sales, installation, and maintenance teams, was placed within ADT Security Services, Inc., another corporation within Tyco's Fire and Security division. Tyco's Security Services is not a part of Tyco Safety Products. *Id.* at ¶¶ 6, 7.

With respect to the third element of a tortious interference claim, SSC asserts that ADT induced Sensormatic to give ADT

---

[28](...continued)
of subsidiary corporations.  Tyco has four principal divisions: electronics; fire and security; healthcare and specialty products; and financing.  (Paper 210, Rogers decl., ¶ 4).

[29] Sensormatic Electronics Corporation is the entity that the court has referred to as "Sensormatic."

authority to sell Sensormatic products in violation of the Franchise Agreement. (Paper 202, at 56). As evidence, SSC presents the testimony of Paul Brisgone, a Tyco executive, who stated that Tyco acquired Sensormatic in order to enhance ADT's position in the retail market. (Paper 202, ex. CC, Brisgone dep. I, 112:12-113:4, June 25, 2002). SSC asserts that the acquisition allowed Sensormatic to use ADT's extensive sales, service, and distribution channels.[30] This evidence is insufficient to satisfy SSC's summary judgment burden. With respect to CCTV products, the evidence indicates that it was Sensormatic, *not ADT*, that decided to pursue a distribution network, and ADT was only one of many distributors/dealers that participated in this network. With respect to EAS products, SSC appears to argue that ADT's inducement to Sensormatic was the promise of ADT's extensive sales, service,

---

[30] SSC also claims that ADT interfered with SSC's ability to offer competitive pricing on Sensormatic products:

> For example, in July 2004, SSC learned that ADT had won a State Department contract for Sensormatic CCTV products with a bid that was $81,000 lower than SSC's bid. SSC had discussed the bidding process with ADT and received authorization from ADT to submit a bid at what ADT represented was the <u>best price</u> that could be offered.

(Paper 202, at 60) (emphasis in original). The capital bidding issue, which apparently involved a discussion between SSC and ADT, is irrelevant to the question of whether ADT induced Sensormatic to breach its contract because Sensormatic was not involved in the incident.

and distribution channels if Sensormatic's sales force was transferred to ADT. As ADT correctly points out, the decision to transfer Sensormatic's sales force was national in scope (paper 210, at 20), and SSC has presented no evidence that the decision was aimed, at least in part, at interfering with the Franchise Agreement in Maryland, District of Columbia, and Virginia. *See havePOWER v. Gen. Elec. Co.*, 183 F.Supp.2d 779, 784 (D.Md. 2002).[31]

Furthermore, with respect to the fourth element (breach of the contract by the third party), a question of fact exists as to whether Sensormatic did breach the Franchise Agreement by authorizing ADT to sell CCTV products.[32] *See supra* Part III.C.1. Thus, SSC has failed to show that it is entitled to summary judgment on its tortious interference with contract claim against ADT (Count VII).

---

[31] SSC contends that *havePOWER* is inapplicable because the breach here involved placing former Sensormatic personnel in a new corporate entity in order to attempt to avoid Sensormatic's obligations under the Franchise Agreement. (Paper 214, at 48). SSC has presented no evidence that the decision was based on a desire to avoid Sensormatic's obligations under Franchise Agreement. Rather, the evidence SSC proffers indicates that the desire to utilize ADT's sales, service, and distribution channels was the prime motivator.

[32] SSC also asserts that after the acquisition, Sensormatic's Retail National Accounts division was transferred to ADT's Commercial National Accounts division (paper 202, ex. AAA), and as result, SSC no longer receives commissions on these sales. (Paper 202, at 59). For instance, SSC asserts that it is no longer allowed to sell to Advance Auto Parts, after that company's account was transferred to the Commercial National Accounts division. From the deposition provided, it appears that Advance Auto Parts purchased CCTV products.

On the other hand, ADT asserts that it is entitled to summary judgment on the tortious interference with contract claim. ADT argues that (1) the undisputed facts demonstrate that ADT's sales did not breach the Franchise Agreement; (2) ADT is privileged from tortious-interference liability as Sensormatic's agent and corporate affiliate; and (3) ADT did not wrongfully and intentionally induce any breach. (Paper 211, at 12).

With respect to the argument that there has been no breach (paper 211, at 13), ADT is incorrect in stating that the Franchise Agreement does not grant SSC any rights to current CCTV products. ADT is also incorrect in stating that pursuant to the Franchise Agreement, SSC does not "have the right to service all Sensormatic products within its territory." *Id*. at 13. Although Sensormatic has the right to contract with third parties to service Sensormatic products sold to national accounts, *see infra* Part F, ADT's assertion fails to recognize that the Franchise Agreement grants SSC the right to service local customers in its territory. *See* (paper 202, ex. A, at ¶ 2). In addition, ADT's argument that it is privileged from tortious-interference liability as Sensormatic's agent is equally unavailing because there is a question of fact as to whether an agency relationship exists between Sensormatic and ADT.

In the alternative, ADT claims that as Sensormatic's corporate affiliate, it is privileged from a claim of tortious interference.

ADT relies on *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 658 (1994), in which the Court of Appeals of Maryland stated: "A parent corporation is generally justified in requiring its subsidiary to modify economic arrangements, contractual or otherwise, if those arrangements do not benefit the parent.  Under these circumstances, interference by the parent is ordinarily not tortious."  ADT asserts that the same privilege between principal and wholly owned subsidiary applies in situations involving affiliates within the same corporation. (Paper 210, at 16).  In support, ADT relies on three cases from outside Maryland: *Shearin v. E.F. Hutton Group, Inc.*, 652 A.2d 578 (Del.Ch. 1994); *Willis v. New World Van Lines, Inc.*, 123 F.Supp.2d 380 (E.D.Mich. 2000); and *MTI/The Image Group, Inc. v. Fox Studios East, Inc.*, 262 A.D.2d 20 (N.Y.App.Div. 1999).  In these cases, the courts recognized that the affiliates or sister corporations had a shared economic interest.  *See Shearin*, 652 A.2d at 591 ("In my opinion, the relationship among wholly owned affiliates with a common parent is no different, insofar as is relevant here, than that between a parent and a subsidiary.  Such entities share the commonality of economic interests which underlay the creation of an interference privilege."); *Willis*, 123 F.Supp.2d at 397 ("Here, all of the Sony defendants are affiliated with each other, have a common corporate parent, and share common economic interests."); *MTI/The Image Group*, 262 A.D.2d at 23 (stating that "all the named

59

companies are affiliated with Morning Studio, either as parent or sister companies, and thus had an economic interest"). However, no Maryland court has recognized a privilege among affiliates in a claim involving tortious interference, nor has any Maryland court recognized generally the concept of a common economic interest among corporate affiliates.[33]  Because the privilege ADT claims is an affirmative defense, *see K & K Management v. Lee*, 316 Md. 137 (1989), ADT had the burden of proof on this issue.  ADT has failed to meet that burden, and accordingly, its motion for summary judgment based on privilege will be denied.  Moreover, even if the doctrine were to apply to affiliates, ADT must show that the arrangement between Sensormatic and ADT did not benefit Sensormatic.  *See Alexander*, 336 Md. at 658 ("A parent corporation is generally justified in requiring its subsidiary to modify economic arrangements, contractual or otherwise, *if those arrangements do not benefit the parent*.").  ADT has provided no argument or evidence on this point, and therefore, ADT is not entitled to summary judgment on this basis.

Finally, ADT argues that SSC has failed to present evidence to support all of the elements of a tortious interference claim. (Paper 211, at 19).  First, with respect to retail division sales,

---

[33] Similarly, District of Columbia and Virginia courts have not recognized a privilege among affiliates in a claim involving tortious interference, nor have they recognized generally the concept of a common economic interest among corporate affiliates.

ADT asserts that SSC cannot show it suffered damages because it is receiving and continues to receive commissions for these sales. With respect to non-retail sales, ADT asserts that it lacked the requisite knowledge that it was interfering intentionally.  ADT does not explain what products are at issue in the non-retail and retail sales or to whom the sales were made.  Because the scope of the Franchise Agreement is defined by the type of product, whether the product was used for theft-detection purposes, and whether the customer was a local or national customer, the court cannot determine whether these sales are within the scope of the Franchise Agreement.  Accordingly, ADT's motion for summary judgment will be denied.

**F.   SSC's Claim for Commissions and Fees on Installation, Service, and Maintenance**

In Count I of the Second Amended Complaint, SSC claims that Sensormatic has authorized third parties to service Sensormatic equipment, and has authorized third parties (i.e., dealers and distributors) to install, repair, and maintain equipment within SSC's territory.  (Paper 33, ¶¶ 46, 47).  In Count II, SSC claims that "third parties authorized by Sensormatic have sold or leased Equipment within SSC's exclusive franchise territory, for which SSC has not received its contractually specified payment."  *Id.* at ¶ 57.  In its motion for summary judgment, SSC asserts it is entitled to receive "all fees for service, repair or maintenance of Sensormatic Equipment in SSC's territory" based on § 7 and § 10 of

the Franchise Agreement.[34]   (Paper 202, at 6).   SSC further asserts

---

[34]     Section 10 of the Franchise Agreement provides:

> [T]he Franchisor shall have the right to
> lease, sell or otherwise distribute Equipment
> to national accounts for use either within or
> without the Franchisee's Territory, *and to
> contract for service, repair and maintenance
> in connection therewith*, provided that in the
> event of any such leases or sales to or
> contracts with national accounts or with
> respect to Equipment for use in the
> Franchisee's Territory, the Franchisee shall
> be entitled to commissions as set forth in
> Section 7 hereof.

(emphasis added).   Section 7 of the Franchise Agreement, which
deals with commissions, provides:

> In the event that the Franchisee performs
> the installation of a Detection Device or
> other Equipment, the entire fee, if any,
> received for the installation thereof shall be
> remitted by the Franchisor to the Franchisee .
> . . . . All fees received on separate service,
> repair and maintenance contracts performed by
> the Franchisee or other fees received for
> other service, repair or maintenance performed
> by the Franchisee shall also be remitted to
> the Franchisee . . . .

With respect to CCTV products, § 2(d) of the Settlement Agreement
provides:

> [I]n the event that the Franchisee performs
> the installation of such Equipment, the
> Franchisee shall be entitled to the entire
> fee, if any, received for the installation
> thereon, exclusive of any portion thereof
> representing payment (at reasonable charges)
> for installation materials furnished by the
> Company.   The Franchisee shall also be
> entitled to all fees received on separate
> services, repairs or maintenance performed by
> the Franchisee or other fees received for
> other services, repairs or maintenance
> performed or parts suppled by the Franchisee .
> . . .

that "Sensormatic is prohibited from granting to any third party any right to sell, lease or service CCTV products in SSC's exclusive franchise territory." (Paper 202, at 7).

Sensormatic responds that the Franchise and Settlement Agreements permit Sensormatic to contract with others to service national accounts, that SSC is not entitled to fees for work performed by others on these national accounts, and therefore, it is entitled to summary judgment. (Paper 210, at 41).

Section 10 of the Franchise Agreement not only grants Sensormatic the right to sell to national accounts but also the right to contract with third parties "for service, repair and maintenance in connection therewith." Moreover, because the Franchise Agreement states that SSC shall receive commissions for service, repair, and maintenance contracts "performed by the Franchisee" and the Settlement Agreement similarly requires that SSC receive fees for services, repairs, and maintenance "performed by the Franchisee," SSC is entitled to commissions and fees only if it performs the work.[35]

SSC contends that the past practice of the parties has been for SSC to do almost all of the installation and service of Sensormatic equipment. (Paper 214, at 34). The court does not consider past practice where the language of the Franchise

---

[35] A similar conclusion was reached in the ongoing Pennsylvania litigation, *Sensormatic Electronics Corp. v. First National Bank of Pa.*, 424 F.Supp.2d 842, 848 (M.D. Pa. 2006).

Agreement is unambiguous. *See Roe*, 190 So. at 619; *Caulkins Indiantown Citrus*, 831 So.2d at 735; *Indian Harbor Citrus*, 658 So.2d at 606; *J.C. Penny Co.*, 345 So.2d at 735. SSC contends that the language in the Franchise Agreement is ambiguous because § 9(c) "gives SSC the exclusive right to service Equipment only if it is located within the territory." (Paper 214, at 34). SSC asserts that the language is ambiguous as to whether Sensormatic's right to contract for service and maintenance was intended to override SSC's exclusive right to maintain such equipment. There is no ambiguity. Section 9(c)states: "*Except as otherwise provided in this Agreement*. . . the Franchisor shall not grant to any third party a franchise or other right to sell, lease or service Equipment in the Franchisee's Territory." Because the section expressly states "except as otherwise provided in this Agreement," it recognizes Sensormatic's right pursuant to § 10 to contract with third parties for service, repair, and maintenance for national account customers.

SSC's second argument that the Settlement Agreement is ambiguous is equally unpersuasive. The Settlement Agreement states that if SSC performs the installation, SSC is entitled to the entire fee, if any, received for the installation of the equipment. If SSC performs separate services, repairs, and maintenance, SSC shall be entitled to all fees. SSC claims that the last sentence of this section – "The Company shall not offer any customer any

64

installation, service, repairs or maintenance at reduced charges (or at no charge) without Franchisee's express consent" – creates an ambiguity because this provision "would make no sense if Sensormatic had the unfettered right to contract with third parties for service, repair or maintenance of Equipment located in the Franchise Territory." (Paper 214, at 35).   The court disagrees. The last sentence merely recognizes that Sensormatic cannot offer reduced charges without Franchisee's express consent, but does not bar Sensormatic from contracting with third parties.   The sentence makes sense in light of the fact that the preceding sentences give SSC the right to the "entire fee" and "all fee" for the installation, service, repair and maintenance work.   Because the past practice has been for Sensormatic to select SSC to do this work (it appears the practice stopped around the time of the Tyco acquisition), it would have been in SSC's interests to put such a limitation in the Settlement Agreement on Sensormatic's ability to reduce these fees.

Sensormatic has demonstrated that it is entitled to summary judgment as a matter of law because the Franchise Agreement is unambiguous with respect to Sensormatic's right to authorize third parties to service, repair, or maintain Sensormatic products that are sold to national accounts.   Accordingly, Sensormatic's motion for summary judgment on this issue will be granted.

G. **Breach of the Franchise Agreement for Failing to Pay Commissions on Replacement Parts (Count IV)**

Sensormatic moves for summary judgment on Count IV of the Second Amended Complaint, in which SSC claims that Sensormatic breached the Franchise Agreement by failing to pay commissions on sales of replacement parts. Section 5(g) of the Franchise Agreement provides:

> The Franchisee shall furnish all customers within the Franchisee's Territory with all installation, service, repair, maintenance, and removal services with respect to Equipment, including all labor and materials (except for Equipment, including replacement parts) without further cost to the Franchisor than the commissions specified in Section 7 hereof . . .

Equipment is defined as "all Detection Devices, Tags, Accessories and Supplies." (Paper 202, ex. A, at § 1(d)). Accessories are defined as "accessories marketed by the Franchisor for use in conjunction with Detection Devices and/or Tags," and supplies are defined as "all spare parts, supplies and other equipment and materials furnished or supplied or approved in writing by the Franchisor for use in or in conjunction with Detection Devices, Tags and/or Accessories." *Id*. at § 1(c). Michele Fisher Blair, the director of Corporate Accounting of ADT, who previously worked for Sensormatic, states that replacement parts "are parts installed during service calls for use in or in conjunction with previously installed Equipment." (Paper 210, Blair decl., ¶ 4). Although the Franchise Agreement does not define "replacement parts," they most

66

closely meet the definition for supplies in that they are a "spare part" or "other equipment" that is used in conjunction with Detection Devices, Tags, and/or Accessories.[36]

The commission system set out in § 7 provides different payments for the sale of Detection Devices and Tags (40% commission) and for Accessories and Supplies (a percentage of the gross revenues).  The only way SSC can obtain a commission is if the parts that are sold are Detection Devices, Tags, Accessories, or Supplies.  There is no question that replacement parts do not qualify as Detection Devices or Tags.  At best, replacement parts qualify as Accessories or Supplies, in which case, § 7.A(ii) states: "It is understood that with respect to the lease or sale of certain Accessories and Supplies there may be no commission payable to the Franchisee."  The Franchise Agreement thus allows Sensormatic to withhold a commission on Accessories and Supplies.

---

[36] SSC contends that replacement parts are not within the definition of supplies.  "Section 5(g) states that Sensormatic is obligated to pay SSC commissions for 'Equipment, including replacement parts' that SSC sells in the course of providing repair or maintenance services." (Paper 214, at 36).  SSC is incorrect.  Section 5(g) merely states that SSC shall furnish customers within the franchise territory with all installation, service, repair, maintenance, and removal services "including all labor and materials (except for Equipment, including replacement parts), without further cost to the Franchisor than the commissions specified in Section 7 hereof."  Section 7, in turn, creates a commission system that provides a different payment for the lease or sale of Detection Devices and Tags (40% commission) and for Accessories and Supplies (a percentage of the gross revenues).  It does not state that Sensormatic is obligated to pay SSC commissions on replacement parts.

Thomas, of SSC, conceded as much when he said "the franchiser has the right to pay us less than the 40 percent commission rate on those items, and in fact, those items that have been designated by the franchiser as accessories have been, to my knowledge, been paid at 0 percent historically, or have not been paid." (Paper 210, Thomas dep., 189:1-7, Mar. 31, 2004). Consequently, Sensormatic did not breach the Franchise Agreement by refusing to pay commissions on the replacement parts.

In the alternative, SSC contends that Sensormatic's determination in 1999 that SSC is no longer entitled to any commission on the sale of replacement parts is in bad faith due to Sensormatic's history of paying a 40% commission to SSC for sales of replacement parts.

Although Florida law recognizes the implied covenant of good faith and fair dealing, there are two restrictions on causes of action based on this doctrine. *See Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So.2d 1232 (Fla.Dist.Ct.App. 2001).

> First, the implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties. Second, a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached. A duty of good faith must
>
> > relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted

> as a source of breach when all other
> terms have been performed pursuant
> to the contract requirements.

*Id.* at 1234-35 (internal citations omitted).  *See also Beach St.*

*Bikes, Inc. v. Bourgett's Bike Works*, *Inc.*, 900 So.2d 697, 700

(Fla.Dist.Ct.App. 2005); *Snow v. Ruden, McClosky, Smith, Schuster*

*& Russell, P.A.*, 896 So.2d 787, 791-92 (Fla.Dist.Ct.App. 2005);

*Avatar Dev. Corp. v. DePani Constr., Inc.*, 834 So.2d 873, 876

(Fla.Dist.Ct.App. 2003).   Because none of the express terms

required Sensormatic to pay commissions on replacement parts, and

in fact one of the terms expressly permitted Sensormatic to pay no

fee on Accessories or Supplies, Sensormatic did not breach the

implied covenant of good faith and fair dealing.   The court will

grant Sensormatic's motion for summary judgment on Count IV.

## IV.  Sensormatic's Counterclaim for Unjust Enrichment

Sensormatic has filed a counterclaim that includes, *inter*

*alia*, a claim for unjust enrichment. (Paper 34, ¶¶ 12-21).   The

counterclaim alleges that "Sensormatic has inadvertently paid

commissions to SSC for Sensormatic CCTV products sold for such uses

[security and access control] by ADT's Federal Systems Group, since

November 2001." *Id.* at ¶ 15.   Sensormatic also "has inadvertently

paid commissions to SSC for other CCTV products sold directly to

customers within SSC's territory, by both Sensormatic and SSC, even

though such CCTV products were not 'Equipment' as defined in the

Franchise Agreement." *Id.* at ¶ 16.   In its motion for summary

judgment on its counterclaim relating to unjust enrichment, Sensormatic asserts that:

> First, Sensormatic has paid too much to SSC in escrow payments under the terms of two agreements, each entitled Dealer's Release Agreement – Option Three" (collectively, "escrow agreements"). Exs. 22-23.  Under these agreements, Sensormatic was required to make escrow payments for certain counties within Maryland and Virginia. *Id.* § 1(a).  Sensormatic mistakenly paid on the wrong counties, too few counties in Virginia and too many in Maryland, with the result of a net overpayment to SSC.
>
> . . .
>
> Second, Sensormatic inadvertently overpaid for source tag labels, by paying a commission for <u>all</u> labels shipped to source taggers within SSC's territory, instead of just the percentage of those labels for which SSC was entitled based on the Source Tagging Agreement.
>
> . . .
>
> Finally, as discussed above, SSC is not entitled to commissions based on any CCTV products sold within the limitations period.

(Paper 210, at 47-48).

Sensormatic's unjust enrichment claim involving escrow overpayments and overpayment for source tag labels appear nowhere in Sensormatic's counterclaim.  A plaintiff may not amend its complaint through arguments at the summary judgment stage.  As the United States Court of Appeals for the Eleventh Circuit has explained:

> In *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506,
> 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), the
> Supreme Court has mandated a liberal pleading
> standard for civil complaints under Federal
> Rule of Civil Procedure 8(a). This standard
> however does not afford plaintiffs with an
> opportunity to raise new claims at the summary
> judgment stage. Indeed, the "simplified
> notice pleading standard relies on liberal
> discovery rules and summary judgment motions
> to define disputed facts and issues and to
> dispose of unmeritorious claims." *Id.*
> Efficiency and judicial economy require that
> the liberal pleading standards under
> *Swierkiewicz* and Rule 8(a) are inapplicable
> after discovery has commenced. At the summary
> judgment stage, the proper procedure for
> plaintiffs to assert a new claim is to amend
> the complaint in accordance with Fed.R.Civ.P.
> 15(a). A plaintiff may not amend her
> complaint through argument in a brief opposing
> summary judgment. *Shanahan v. City of Chicago*,
> 82 F.3d 776, 781 (7th Cir. 1996).

*Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004); *see also Icee of Am., Inc. v. Mid-American Icee Corp.*, No. 3:02-CV-0364-L, 2005 WL 2415940, at *19 n. 20 (N.D.Tex. Sept. 29, 2005); *Arnold v. Storz*, No. 00-CV-4485 (CBA), 2005 WL 2436207, at *5 (E.D.N.Y. Sept. 30, 2005); *Beckman v. U.S. Postal Serv.*, 79 F.Supp.2d 394, 407-08 (S.D.N.Y. 2000). To the extent that Sensormatic seeks to add an unjust enrichment claim relating to overpayment of escrow payments and for source tag labels, the proper procedure is for Sensormatic to file a motion to amend its counterclaim in according with Rule 15(a).

With respect to the CCTV products, it is unclear from Sensormatic's arguments and the evidence it provides as to whether

the products at issue involve the same products alleged in the complaint (i.e., "CCTV products sold for such uses by ADT's Federal Systems Group, since November 2001" and "other CCTV products sold directly to customers within SSC's territory."). Moreover, CCTV products are within the scope of the Franchise Agreement to the extent they are used for the prevention and detection of shoplifting and other theft.

Sensormatic's motion for summary judgment on the unjust enrichment counterclaim also invokes the affirmative defense of set-off. (Paper 210, at 46). The Supreme Court of Florida has explained the difference between a set-off and a counterclaim:

> A "set-off" has been defined as a mode of defense whereby the defendant acknowledges the justice of the complainant's demand on the one hand, but on the other sets up a demand of his own to counterbalance it either in whole or in part. A set-off is not technically a mere matter of defense, although in a certain sense, it is of a defensive nature. *Steck v. Colorado Fuel Co.*, 142 N. Y. 236, 37 N. E. 25 L. R. A. 67; *Stadler v. Helena First National Bank*, 22 Mont. 190, 56 P. 111, 74 Am. St. Rep. 582. On the other hand, a "counterclaim" is a cause of action existing in favor of the defendant against the complainant. *Venable v. Dutch*, 37 Kan. 515, 15 P. 520, 1 Am. St. Rep. 260. A counterclaim is the equivalent of a set-off and a recoupment combined. *Folsom v. Carli*, 6 Minn. 420 (Gil. 284), 80 Am. Dec. 456. A recoupment may spring from a wrong, provided it arises out of the transaction set forth in the bill of complaint, but a recoupment goes to the justice of the complainant's claim and no affirmative judgment can be had thereon against the complainant. *Ansley v. Bank of Piedmont*, 113

72

> Ala. 467, 21 So. 59, 59 Am. St. Rep. 122; note
> to Ann. Cas. 1914B, 119.

*Peacock Hotel v. Shipman*, 138 So. 44, 47 (1931). To plead properly a set-off, "the answer must not only set up new affirmative matter which would constitute a defense, but must set up such an independent right in the defendant as will make his claim a proper matter of set-off or counterclaim as these terms are used in the law." *Id.* Thus, because set-off is a different legal theory, it does not support Sensormatic's motion for summary judgment. In addition, Sensormatic's answer ("SSC's claims against Sensormatic are barred, in whole or in part, by the doctrine of setoff.")(paper 34, at 17), is insufficient to plead properly the affirmative defense of set-off in that it does not "set up such an independent right in the defendant as will make his claim a proper matter of set-off." Accordingly, Sensormatic's motion for summary judgment on the unjust enrichment counterclaim will be denied.

## V. Motions to Seal

SSC, Sensormatic, ADT, and Wallace have filed several motions to seal documents pursuant to Local Rule 105.11. It provides:

> Any motion seeking the sealing of pleadings,
> motions, exhibits or other papers to be filed
> in the Court record shall include (a) proposed
> reasons   supported   by   specific   factual
> representations to justify the sealing and (b)
> an  explanation  why  alternatives  to  sealing
> would not provide sufficient protections. The
> Court will not rule upon the motion until at
> least 14 days after it is entered on the
> public  docket  to  permit  the  filing  of
> objections by interested parties. Materials

73

> that are the subject of the motion shall
> remain temporarily sealed pending a ruling by
> the Court.  If the motion is denied, the party
> making the filing will be given an opportunity
> to withdraw the materials.

There is a well-established common law right to inspect and copy judicial records and documents.  *See Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 597 (1978).  If competing interests outweigh the public's right of access, however, the court may, in its discretion, seal those documents from the public's view.  *See In re Knight Publ'g Co.,* 743 F.2d 231, 235 (4th Cir. 1984).

Furthermore, prior to sealing any documents, the court must provide notice of counsel's request to seal and an opportunity to object to the request before the court makes its decision.  *See Knight,* 743 F.2d at 235.[37]  Either notifying the persons present in the courtroom or docketing the motion "reasonably in advance of deciding the issue" will satisfy the notice requirement.  *Id.* Finally, the court should consider less-drastic alternatives, such as filing redacted versions of the documents.  If the court decides that sealing is appropriate, the court should provide reasons, supported by specific factual findings, for its decision to seal and for rejecting alternatives.  *Id.*

---

[37]  Although the court must provide notice prior to making a decision to seal, it is appropriate temporarily to seal documents while the underlying motion to seal is under consideration.  *See Knight*, 743 F.2d at 235, n.1.

The documents that the parties seek to seal involve memorandum, depositions, contracts, and other business records. (Papers 203, 212, 213, 217).   The motions are unopposed.   The motions to seal do not offer, however, "specific factual representations" to justify the sealing.   The only justification for sealing offered by any party is the existence of a joint confidentiality order.   This confidentiality order provides that all parties to this case must move to file under seal any documents that disclose information designated as "confidential."   *Id*. Characterizing documents as "confidential" without any description of what information they contain or why that information should be protected does not satisfy the "specific factual representations" that Local Rule 105.11 requires.

Because the parties have failed to comply with Rule 105.11, the court will deny their motions to seal.   SSC, Sensormatic, ADT, and Wallace will have 15 days to renew their motions with memoranda that comply with Rule 105.11.   In the meantime, the papers will remain temporarily under seal.   If they do not renew their motions, the papers will be unsealed.

## VI. Conclusion

For the foregoing reasons, the court will grant in part and deny in part SSC's motion for partial summary judgment; deny in part and grant in part Sensormatic's cross-motion for summary judgment and deny its motion for summary judgment on its

counterclaim; deny ADT and Wallace's cross-motion for summary judgment; and deny all motions to seal.  A separate Order will be entered.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge